Filed 8/2/24; Modified and Certified for Pub. 8/29/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MICHAEL S. HILL,<br><br>    on Habeas Corpus. | A166191<br><br>(Alameda County<br>Super. Ct. No. HC846751) |

     In 1987, Michael Hill was convicted of two murders and sentenced to death. He has always maintained the murders were committed by Michael McCray,[1] whose statements to the police incriminating Hill (and incriminating himself as an aider and abettor) were a significant part of the People's case at trial. McCray invoked his constitutional privilege against self-incrimination and did not testify at trial, but his statements were admitted under the declaration against penal interest exception to the hearsay rule. Some two decades after Hill's convictions, he learned that the prosecution had failed to disclose evidence that the district attorney's office had promised not to prosecute McCray for offenses arising from the conduct he described during the investigation of this case.

     Hill filed a petition for writ of habeas corpus alleging a number of claims, two of which are at issue on this appeal. First, Hill contends that the

---

[1] McCray is no longer alive.

1

People's failure to disclose this evidence violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). Second, he contends the People violated *Napue v. Illinois* (1959) 360 U.S. 264 (*Napue*) by knowingly allowing McCray to testify falsely at the preliminary hearing that he had received no leniency for his testimony against Hill and then to assert an invalid claim of privilege to avoid testifying at trial, enabling the People to present McCray's statements to the police while denying Hill the opportunity to cross examine McCray. The trial court found that Hill failed to establish a prima facie case and dismissed his claims. We conclude the petition's allegations were sufficient to make a prima facie case of *Napue* and *Brady* violations and remand for further proceedings.

## BACKGROUND

## I.

### *Hill's Conviction and Post Trial Proceedings*

#### A. The Offenses

Our description of the case presented at trial is taken largely from the California Supreme Court's opinion affirming Hill's convictions. (*People v. Hill* (1992) 3 Cal.4th 959 (*Hill*), overruled on unrelated grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13), supplemented as appropriate by our review of the trial record. After a preliminary hearing held in April and May 1986, Hill was charged by information on May 19, 1986, with two counts of murder, one count of robbery, special circumstances of multiple murder and murder committed during a robbery, and enhancements for use of a firearm, and alleged that he had previously been

2

convicted of possession of narcotics for sale. (*Hill,* at pp. 972-973.)[2] Hill pleaded not guilty and denied the special circumstances and other allegations, but subsequently amended his plea to admit the alleged prior conviction. (*Id.* at p. 973.)

### 1. *The People's Case*

"On August 15, 1985, the bodies of Anthony Brice, Sr. (Brice), and his four-year-old son, Anthony Brice, Jr. (Anthony), were found by police on the floor of the jewelry store operated by Brice" at 38th and Foothill in Oakland, California. (*Hill, supra,* 3 Cal.4th at pp. 971, 974.) "Each victim had been shot in the head at close range with a .38-caliber gun. The appearance of the crime scene suggested there had been a robbery. Within a week after the killings, the Alameda County Board of Supervisors offered a $5,000 reward for information resulting in the arrest and conviction of the killer(s)." (*Hill, supra,* 3 Cal.4th at p. 971.)

The primary investigator on the case, Oakland Police Department Sergeant Gerald Medsker, learned of Hill's possible involvement on August 22, 1985. (*Hill, supra,* 3 Cal.4th at pp. 971-972.) On September 11, 1985, Hill gave three statements to the police, recorded on audio tape, in which he incriminated McCray, an illegal drug dealer. (*Id.* at p. 972.)

McCray was arrested that evening.[3] (*Hill, supra,* 3 Cal.4th at p. 972.) The police found a pouch of jewelry in McCray's automobile, which he said he had won in a poker game. (*Ibid.*) In the room where McCray was living, the

---

[2] The information additionally alleged enhancements for infliction of great bodily injury, but the prosecution later amended the information by striking these allegations. (*Hill, supra,* 3 Cal.4th at p. 973.)

[3] Although the police looked for McCray based on the information from Hill, he was arrested for unrelated offenses.

police found "found twenty-eight assorted gold chains in an envelope, two shotguns, three baseball bats, an assortment of shotgun, rifle, and pistol ammunition, empty .38- and .44-caliber shells, and narcotics paraphernalia." (*Ibid.*)

"When interrogated by the police, McCray incriminated [Hill] by asserting as follows: [Hill] had owed McCray $600 for cocaine. On the day of the Brice killings, McCray loaned [Hill] a .38-caliber handgun and ammunition. McCray provided [Hill] with the gun because [Hill] had said he intended to use it in a robbery. [Hill] returned to McCray's house the afternoon of the killings with a brown paper bag containing at least three dozen gold chains and one dozen watches. [Hill] also had about $300 in cash, which he claimed to have taken from a jewelry store. He gave McCray $150 in cash and jewelry worth about $450." (*Hill, supra,* 3 Cal.4th at p. 972.) Hill removed the gun McCray had given him from his waistband and unloaded it; McCray was " 'pretty sure' there were three empty shells taken from the gun." (*Id.* at p. 976.)[4] McCray was never charged with any offense related to the robbery and murders.

The prosecution's theory at trial was that Hill robbed and killed the Brices because he was under pressure to repay a drug debt to McCray, and that McCray was Hill's accomplice as a result of having loaned him the gun with knowledge that Hill intended to use it to commit a robbery. (*Hill, supra,* 3 Cal.4th at p. 973.) McCray did not testify. Sergeant Jerry Harris, Sergeant

---

[4] McCray was interviewed in several segments between 11:32 p.m. on September 11, 1985, and the early afternoon on September 12, and only portions of the interviews were tape recorded. Specifically, the officers recorded a portion of the interview from 12:08 to 12:38 a.m., a portion from 1:01 to 1:05 a.m., and a portion beginning at 5:28 a.m.

Medsker's investigative partner, testified to portions of the statements that McCray gave to the police after his arrest. (*Id.* at p. 976.)

Derek Agnew testified that he had entrusted Brice with about $550 cash to keep in the store's safe. (*Hill, supra,* 3 Cal.4th at p. 973.) Two days before the killings, Agnew went to the store and gave Brice an additional $150 for safekeeping. (*Ibid.*) Hill was in the store and Agnew testified that as he started counting his money, Hill " 'was in my business.' " (*Ibid.*) Agnew sometimes purchased jewelry from Brice which he then resold. He had seen Hill at the store six or seven times, usually just talking with Brice but once or twice purchasing jewelry. It was obvious that Hill and Brice were friends.

Robert Fox, a costume jewelry salesman, was in Brice's store at about noon on the day of the killings and noticed that Brice had a large amount of currency in his pocket. (*Hill, supra,* 3 Cal.4th at p. 973.) Hill came into the store while Fox was there and was the only person in the store with the Brices when Fox left. (*Ibid.*)

Denine Houston and her boyfriend Sam Dartez lived in a house in Oakland that was rented by Rudy Wilkins and Annie Mae Smith; at the time of the offenses, Hill, who was Wilkins's cousin, was also staying there. Houston testified that she heard Hill tell her boyfriend on the morning of August 13, 1985, that he had a "lick up" (meaning "robbery") at a "slum shop" (meaning "fake jewelry store") " 'on Foothill off of 38th and he can get in because he know the people real good, and he had to have some money cause he was tired of being broke.' "[5] (*Hill, supra,* 3 Cal.4th at pp. 973-974.) On the

---

[5] In her statements to the police, Houston did not say that Hill had talked to Dartez about a "lick" around two days prior to August 15; she said this for the first time at the preliminary hearing.

morning of August 15, Hill " 'was talking about going to get his piece [gun], going to take care of his business,' " then returned an hour or two later with a gun similar to the .38-caliber Smith & Wesson revolver in evidence at trial.[6] (*Id.* at p. 974.) Although Houston testified that Hill pulled the gun out and showed it to her, when interviewed by the police during their investigation, she had said she did not get a good look at the gun because she saw it when Hill was putting it in his pants or coat. Hill told Houston he was tired of being broke, left and returned three or four hours later with a brown paper bag containing " 'a bunch of slum jewelry,' 'pockets full of money,' and an 'eight ball [one-eighth ounce] of cocaine.' " (*Ibid.*)

Houston testified that she had seen Hill with slum jewelry every day for two weeks prior to the day of the murders, and that Hill did not sell the jewelry for money but rather traded it for drugs. She acknowledged that she "got high all day long every day" and that at the time of trial she was on probation for selling crack and in custody for a probation violation.

Dartez, Houston's boyfriend, testified that a day or two before the killings, Hill said, " 'He got a lick up and he's going to have some money." (*Hill, supra,* 3 Cal.4th at p. 974.) Dartez had known Hill for three to four years and sold slum jewelry with him. (*Id.* at p. 975.) On August 15, Dartez had gone to court for a 9:00 a.m. appearance on a cocaine possession charge but after a short time returned to the house because the matter was continued to the afternoon. He got back at about 9:30 or "something to 10:00" and did not see Hill at the house between then and when he left for court in the afternoon. As he was leaving for court, he saw defendant coming toward the house with a " 'big grocery bag' containing 'slum jewelry, watches, chains,

---

[6] The gun in evidence was not the gun used in the robbery but was offered as an exemplar of a .38-caliber pistol.

6

a whole bunch of chains.' " (*Ibid.*) Dartez had never seen Hill with so much jewelry before. (*Ibid.*) Hill said, " 'Man, we got work to do,' meaning to Dartez that they needed to sell the jewelry." (*Ibid.*) Hill gave Dartez $20 to buy cocaine, which Dartez bought and consumed with Hill at the house. (*Ibid.*) Later that day, Hill paid for cocaine that someone brought to the house; he had " 'a lot of money . . . a wad.' " (*Ibid.*) Marta Daniels, McCray's " 'common law' sister-in-law," came to the house around 3:30 then left with Hill after the group had partaken of the cocaine.

Smith saw Hill at the house on August 15 with " 'a bag of jewelry, some money and a gun' " that was "substantially similar" to the one in evidence. (*Hill, supra,* 3 Cal.4th at p. 974.) Hill said, " 'This is the way to get yours' " (*ibid.*) and paid her and Rudy some money he owed them. Hill also had some cocaine, which she, Hill, Houston and Dartez smoked. Smith testified that she did not smoke much cocaine; she generally used heroin.

Wilkins testified that on the morning of August 15, Hill showed him a .38-caliber revolver similar to one in evidence and asked for some .38-caliber bullets, which Wilkins did not have. (*Hill, supra,* 3 Cal.4th at p. 974.) Hill left and returned midafternoon with a brown paper bag full of gold-colored necklaces and a " 'wad of money' " in his pocket. (*Ibid.*) Hill repaid Wilkins $30 and said that " 'he had knocked over a jewelry store and he had snuffed somebody.' " (*Ibid.*) Wilkins testified that he used heroin, including on August 15, but that he used it in the afternoon, not the morning. Wilkins acknowledged he was "falling asleep" while testifying but denied it was because he was on drugs.

Daniels testified that Hill came to the apartment where she and McCray both lived on the morning of August 15, 1985, and spent about five minutes with McCray. Daniels asked Hill for a dollar and he said he had no

7

money but "would have one 'when he got through with his lick.' " (*Hill, supra,* 3 Cal.4th at p. 974.) "To Daniels, a 'lick' meant a 'robbery,' a 'scam,' a 'con,' or 'any kind of thing where you get something for doing something wrong." (*Ibid.*) Hill left, then returned a few hours later and Daniels let him in; neither she nor McCray had left home. Daniels did not see a gun or jewelry on Hill's person and did not see him with a grocery bag of jewelry; when shown that she had told the police Hill was carrying a brown paper bag, she testified that she did not remember seeing this. After Hill spent about five minutes with McCray in his room, Hill and McCray each gave Daniels $50 to buy cocaine. Hill had a " 'fan of money' that Daniels estimated to be 'about 600 dollars' " and said " 'he had to have his and he was going to get it and this is what he got.' " (*Hill*, at p. 974.) Daniels testified that she did not go to Wilkins' house on the afternoon of August 15.

Wilbert Winchester, who had known Hill for many years, testified that "perhaps a day or two, maybe a week" after the murders, Hill asked if he wanted to buy a .38-caliber pistol. (*Hill, supra,* 3 Cal.4th at p. 975.) Winchester declined because he did not want a pistol and he was on parole. (*Ibid.*) He did not see a gun. (*Ibid.*)

Ranee Bennett, a methadone addict, first met Hill on August 19, 1985, at a taco restaurant. (*Hill, supra,* 3 Cal.4th at p. 975.) Hill " 'said he was trying to down [sell] some pills and a gun' " and she could see a gun in his waistband that "resembled" the one in evidence and Hill said was a .38–caliber. (*Ibid.*) Hill left but returned later that day; he said he had nowhere to stay and Bennett offered to let him stay at her home. (*Ibid.*) He no longer had the gun. (*Ibid.*) On or about August 30, Bennett asked Hill about a robbery and murder because "she had been hearing things" and he said he had done it. (*Ibid.*) She asked " 'why did he shoot the kid and he said

8

because they knew him. . . . He said it was a jewelry store. . . . It was in Oakland. . . . It was a man and his son. . . . [Hill] Said it was a robbery. . . . The robbery was supposed to have been done with a .38.' " (*Ibid.*)

Arthur Allen, a jailhouse informant, was Hill's cellmate at the Santa Rita jail in September 1985. (*Hill, supra,* 3 Cal.4th at p. 975.) Allen testified that Hill said he shot two people and robbed a jewelry store; that " '[h]e shot . . . the older man because I guess he thought he was going for a gun or some kind of weapon, but he just shot the boy because [the] boy could have recognized him' "; and that before being shot, the little boy said, "Uncle Mike." (*Id.* at pp. 975-976.) As noted in *Hill,* Allen testified that Hill said " 'there was blood all over the counter' at the jewelry store" but this was contradicted by a police officer's testimony that no blood was found on the counter. (*Id.* at p. 976.) Allen also testified that Hill said he owed a $30,000 to $35,000 drug debt. Allen was in jail for receiving stolen goods and "was released from custody earlier than normal after informing his jailers of defendant's admission." (*Ibid.*)

Another jailhouse informant, Clifford Turner, met Hill in May or June 1985, at which time Hill offered to sell him a gun; he was subsequently arrested and was in the cell next to Hill's when Hill arrived at Santa Rita. (*Hill, supra,* 3 Cal.4th at p. 976.) Turner testified that Hill "admitted he had robbed Brice and killed Anthony because 'the little boy knew him as Uncle Mike.' " (*Ibid.*) According to Turner, Hill said he used a .357 magnum, which was the type of weapon Hill had tried to sell Turner. In December 1985, Turner pleaded guilty to three counts of robbery, two counts of assault with a deadly weapon and a petty theft with a prior conviction and, while awaiting sentencing, wrote to the district attorney, "offering to 'help the state . . . if the state is willing to help me, and if not I'm still willing to help

9

the District Attorney's office.' " (*Ibid.*)  At the time, Turner was " 'very angry' " at Hill." (*Ibid.*)

A pathologist testified that he extracted two slugs from Brice's head and one from Anthony's head.  (*Hill, supra,* 3 Cal.4th at pp. 976-977.)  A police department criminalist testified that all three slugs had been fired from a .38-caliber gun.  (*Id.* at p. 977.)  The gun introduced as People's exhibit No. 4-A was one of four brands of .38-caliber handguns that could have fired the slugs.  (*Ibid.*)

As will be discussed *infra*, Hill's postconviction habeas petitions alleged that not only McCray but virtually all the prosecution witnesses received favorable treatment from the prosecution in connection with their own criminal matters and/or rewards for the information they provided.  None of this allegedly suppressed evidence was available for impeachment of the prosecution witnesses at trial.

### 2. *The Defense Case*

Hill's defense was that Michael McCray had killed the Brices and was attempting to exculpate himself by incriminating Hill.  (*Hill, supra,* 3 Cal.4th at p. 977.)  Hill testified that "several of the prosecution witnesses were either lying or mistaken as to his alleged statements and actions." (*Ibid.*)  He testified that he had known Brice about 12 years and was a friend of both Brice and Anthony.  (*Ibid.*)[7]  On August 15, Hill went to Brice's store "to get some slum jewelry and to attempt to sell some videocassette recorders (VCR's).  He knocked on the door and was let into the shop by Robert Fox. Brice and Anthony were in the store. Fox then left and Brice asked defendant to buy some cigarettes." (*Ibid.*)  Hill used the door keys to let himself out of

---

[7]  Hill was also a friend of Brice's wife, whom Hill had known since grade school.

the store and, as he was walking to a grocery, he saw McCray in a car parked across the intersection from Brice's store; as he was returning, McCray called out to him. (*Ibid.*) Hill approached and McCray asked who was in the jewelry store and whether Brice had any money. (*Ibid.*) Hill said both Brices were there, returned to the store, used the keys to enter and told Brice about the conversation he had just had with McCray. (*Ibid.*)

About 10 minutes later, there was a knock at the door and Hill looked out and saw McCray. (*Hill, supra,* 3 Cal.4th at p. 977.) Hill told Brice that McCray was at the door and Brice threw him the keys and told him to open the door. (*Ibid.*) McCray entered, pulled out a gun, went behind Brice and fired the gun. (*Ibid.*) Hill ducked and fled the store. (*Ibid.*) He heard a second shot as he fled. (*Ibid.*)

Hill paid a passing motorist to drive him away from the scene and got out a few blocks away. (*Hill, supra,* 3 Cal.4th at p. 977.) As he walked down the street, he saw a friend who paid him $650 for VCRs Hill had sold him. (*Ibid.*) As this was happening, McCray drove up and gave Hill a grocery bag of slum jewelry "like that he had seen in Brice's store." (*Ibid.*) Hill did not want the jewelry because he knew it was stolen, but he took it and began walking toward the house where he was living. (*Ibid.*) On the way, he came across Dartez and asked him to help sell the slum jewelry. (*Ibid.*) Dartez declined and Hill gave him $20 to buy cocaine, which they smoked at the house. (*Id.* at pp. 977-978.) Dartez then left for a court appearance, and Hill remained at the house. Later that afternoon, more cocaine was delivered to the house and Hill paid $150 for it. (*Id.* at p. 978.) Marta Daniels came to the house at about 4:30 p.m. and Hill gave her the grocery bag and about one-half of the jewelry McCray had given him earlier. (*Ibid.*)

11

Hill testified on cross-examination that several of his statements during his police interrogation were false and that he initially concealed McCray's alleged involvement because he was afraid of McCray. (*Hill, supra,* 3 Cal.4th at p. 978.)

Several prosecution witnesses testified on cross-examination that later on the evening of August 15 McCray came to the house several times looking for defendant and saying he " 'wanted his shit.' " (*Hill, supra,* 3 Cal.4th at p. 978.)

### B. Legal Proceedings

The jury found Hill guilty as charged of the count of robbery and two counts of first degree murder, found true the charged special circumstances and personal use of a firearm. After the conclusion of trial and entry of the abstract of judgment and commitment order, the court, "acting on information from" the prosecutor, entered an order providing for distribution of the reward money authorized in 1985 as follows: $1,500 to Bennett, $500 each to Allen and Turner, $400 each to Wilkins and Houston, $350 to Daniels, $300 each to Smith, Dartez, and two individuals who do not appear to have testified at trial, and $150 to Robert Fox.

Hill's convictions and death sentence were affirmed on direct appeal. (*Hill, supra,* 3 Cal.4th at p. 971.) In 1998, he filed identical petitions for writ of habeas corpus in the California Supreme Court and in federal district court. Federal proceedings were stayed pending completion of exhaustion proceedings in state court. The California Supreme Court denied the petition in 2006 and the federal stay was lifted in February 2007, but the matter was again stayed in 2008 due to competency proceedings that lasted several years. Hill's competency was deemed restored in 2012.

After postconviction discovery proceedings, which focused on evidence allegedly withheld by the prosecution in violation of *Brady*, Hill amended his federal habeas petition to add claims based on newly discovered evidence. His amended petition, filed on November 2, 2018, alleged 16 claims, many with multiple subparts. On September 27, 2021, the federal district court found some of Hill's claims to be unexhausted, ordered Hill to present these claims to the state court within 30 days, and stayed federal proceedings.

## II.

### *The Present Habeas Petition*

### A. Background

#### 1. *McCray's Testimony at the Preliminary Hearing*

McCray was called as a witness for the defense at the preliminary hearing and appeared with counsel Judith Browne. He testified that he had been convicted in federal court of distributing heroin and was to be sentenced the following week, and acknowledged that he had prior convictions for manslaughter, robbery, receiving stolen property and "ex-con with a gun" and had served prison terms for the manslaughter and robbery. Under the advice of counsel, he exercised his Fifth Amendment right to refuse to answer questions about Hill, events on August 15, 1985, or Brice and his son.

McCray then testified that in September 1985, while under arrest for possession of cocaine and possession of a sawed-off shotgun, he gave a statement to the police about his whereabouts on August 15, 1985. When asked, "did any anyone from the Oakland Police Department ever promise you any kind of immunity, partial immunity or leniency if you gave them a statement with respect to this particular case?" McCray responded, "No sir; they did not." He denied that anyone from the Oakland Police Department "promised [him] any kind of leniency" in this case.

When asked whether he was "promised any kind of leniency by the district attorney's office of Alameda County if [he] would have testified in this particular case," McCray answered that he "had not." He responded the same way when asked whether he had "personally had any contact with any members of the Alameda County District Attorney's office." When McCray was asked whether he had "received any information through [his] lawyers with respect to any kind of form of leniency that might be involved with respect to any charges which might be forthcoming [¶] . . . [¶] . . . in the murder of Anthony Brice, Sr., and Anthony Brice, Jr.," the court sustained McCray's attorney's attorney-client privilege objection.

When McCray again invoked his privilege against self-incrimination in response to questions about the Brices, defense counsel asked the court to order the district attorney to provide McCray with immunity so that he could testify. The prosecutor objected, and the trial court denied the request.

### 2. McCray's Exercise of the Privilege Against Self-Incrimination at Trial

At trial, McCray was a prosecution witness. At the beginning of the trial, while discussing scheduling and other housekeeping matters after the jury was selected, the prosecutor told the court he was expecting to have "somebody here to represent" McCray because "in fact and legally he would be and is an accomplice both before and after the fact." The prosecutor stated that "[w]e are not going to give him immunity" and his "impression" was that McCray would "take the Fifth," making McCray unavailable for trial and therefore allowing admission of taped statements McCray made to the Oakland police that were against his penal interest under the hearsay

14

exception for declarations against interest.[8]  The prosecutor went on to say the parties would need to determine which of McCray's statements were against penal interest and the court would need to rule on their admissibility. Defense counsel agreed that McCray's statements against penal interest were admissible but pointed out that to the extent any of his statements were exculpatory, they would not come within the hearsay exception.

Outside the presence of the jury, McCray testified that he was currently in federal custody and knew Hill, whom he identified in court.  He then refused to answer a series of questions about August 15, 1985, on the grounds it might incriminate him:  whether he recalled seeing Hill on the morning of August 15, 1985, whether he recalled giving Hill a gun that morning, whether Hill returned that afternoon with a "bag full of jewelry and assorted watches and things like that," and whether Hill removed three empty shell casings from the cylinder of a .38-caliber Smith and Wesson handgun.  Asked if he intended to claim his Fifth Amendment privilege to refuse to answer any questions related to events on August 14, 15 and 16, 1985, McCray said "yes" and the prosecutor said he had no further questions.

On cross examination, asked if it was true that he went to the jewelry store in the area of 38th and Foothill on August 15, 1985, and killed a four-year-old child, McCray initially responded that it was not true, then after his attorney interjected and the two conferred, McCray refused to answer and

---

[8]  Under the hearsay exception for declarations against interest, as relevant here, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."  (Evid. Code, § 1230.)

15

the court struck the initial response. Defense counsel asked if it was true that McCray went to the jewelry store on August 15, 1985, and killed Brice, and McCray refused to answer. McCray was excused.

At this point, the prosecutor told the court that the first requirement for introducing McCray's statements against penal interests had been satisfied because McCray was unavailable. The prosecutor reiterated that based on some of McCray's statements, "he legally would be both an accessory before and after the fact at least to a robbery, which under the law of felony murder would make him accessory, aider and abettor to both homicides because of actions taken before and after the crimes themselves. [¶] At this time we are not going to provide Mr. McCray with any immunity under [section] 1324. Therefore his invoking the Fifth Amendment makes him unavailable at this time."

Counsel and the court then went through the transcripts[9] of McCray's statements to determine which would be admitted. Defense counsel stated that he intended to call one of the officers who took McCray's statements and question him about questions and answers counsel believed were declarations against McCray's penal interest. The parties agreed as to admissibility of most of the statements and the court ruled on the few that were disputed.

### 3. *Discovery of Previously Undisclosed Evidence*

According to the allegations of the present habeas petition, in 2007, the People produced documents in postconviction discovery pursuant to Penal Code section 1054.9, which became effective on January 1, 2003. (Stats. 2002, ch. 1105, § 1; *In re Steele* (2004) 32 Cal.4th 682, 690.) One of the

---

[9] The transcripts were marked as defense exhibits for purposes of the hearing.

16

previously undisclosed documents was a letter dated February 13, 1986, from Assistant District Attorney Albert Meloling to Assistant Public Defender Judith Browne,[10] who at that time represented McCray.  The letter, exhibit 38 to the petition ("exhibit 38"), refers to the municipal court docket number for Hill's case and states:  "Pursuant to our recent conversation with reference to the above subject, this letter is written to assure you that Michael McCray will not be charged or tried for any crime arising out of his conduct disclosed to this office during our investigation which resulted in the charges reflected in Oakland Municipal case # 265771."

Hill alleged that exhibit 38 was not disclosed prior to or during Hill's trial, during his direct appeal or during the pendency of his habeas petition in the California Supreme Court despite Hill's multiple discovery requests and the People's obligation to produce it even without a request.  Obviously, it also was not produced prior to the preliminary hearing, which took place in April and May 1986.

Hill additionally alleged that the previously undisclosed evidence included impeachment material related to many of the prosecution's witnesses other than McCray.  Although Hill's claims directly based on nondisclosure of this evidence are not at issue on this appeal,[11] he argues that the trial court was required to consider his allegations and supporting documents as part of the record on which the court based its determination whether Hill sufficiently showed that exhibit 38 was material.

[10]  The letter is addressed to "Judy Brown."  We use the name and spelling counsel provided at the preliminary hearing.

[11]  These claims (claim 2, subclaims H-Q) were among those denied by the trial court as to which we denied Hill's request for a certificate of appealability.

17

**B. Legal Proceedings**

Hill filed the present petition on October 27, 2021. With the exception of claim 2, subclaims A through G, and claim 16, the trial court denied Hill's claims as successive (Pen. Code, § 1509, subd. (d); *In re Friend* (2021) 11 Cal.5th 720) or otherwise procedurally barred (*In re Miller* (1941) 17 Cal.2d 734, 735 [prior petition on same grounds denied]). Subclaims A through G of claim 2 were based on the alleged failure of the People, for over 20 years, to disclose evidence that the prosecution had agreed not to prosecute McCray. Claim 16 alleged cumulative error.

Hill alleged that the undisclosed evidence was material impeachment evidence, the suppression of which violated the prosecution's obligations under *Brady, supra,* 373 U.S. 83, and that the suppressed evidence enabled the prosecution to knowingly present false evidence in violation of *Napue, supra,* 360 U.S. 264. The alleged false evidence was McCray's testimony at the preliminary hearing that he had not received any kind of leniency for his statements incriminating Hill. The petition alleged that the People used this false testimony to deceptively enable McCray to assert his privilege against self-incrimination at trial, which in turn enabled the prosecution to introduce McCray's statements incriminating Hill without subjecting McCray to cross examination.

As we will explain in greater detail, the trial court found that Hill established two of the three requirements for a *Brady* violation, as exhibit 38 was "clearly impeachment material" and therefore " 'favorable to the defense' " and it was not disclosed to the defense until long after trial. It found Hill failed to establish a prima facie case for relief, however, because the evidence against him at trial was "so overwhelming that the failure to disclose the non-prosecution agreement does not undermine this court's

18

confidence in the verdict." As to the *Napue* claim, the court found Hill did not establish a prima facie case because he failed to plead that false evidence was presented to the jury, as the court believed was required under *Napue.* Accordingly, the court denied these claims and denied claim 16 because it did not find "any error to cumulate."

Hill appealed and requested a certificate of appealability. We concluded no certificate of appealability was required as to claim 2, subclaims A-G, and claim 16 because the trial court did not deny those claims as successive. (Pen. Code, § 1509.1, subd. (c).) Accordingly, the appeal could proceed as to those claims. We denied the request for a certificate of appealability as to the remaining claims in the petition.

## DISCUSSION

## I.

### *Introduction*

There is quite a bit of overlap between Hill's claims under *Napue, supra,* 360 U.S. 264 and *Brady, supra,* 373 U.S. 83, as both turn on the significance of exhibit 38. Hill contends the prosecution's suppression of exhibit 38 and support for what Hill sees as an invalid exercise of privilege by McCray had two primary consequences: First, the defense was unable to undermine McCray's credibility with evidence that he was motivated by self-interest to support the prosecution and, second, McCray was able to falsely assert a constitutional privilege not to testify when in fact there was no prospect of him being prosecuted for the offenses in which his testimony would incriminate him. Since the prosecution expressly declined to grant McCray immunity, McCray's invocation of the privilege against self-incrimination made him unavailable for trial, resulting in the admission of his statements to the police under the hearsay exception for statements

19

against penal interest and depriving the defense of the ability to subject him to cross examination. Hill's *Napue* claim centers on the prosecution's alleged misconduct in knowingly presenting a false picture of McCray's potential criminal liability. Although a *Brady* claim does not require proof that the failure to disclose material favorable evidence was intentional, in this case the alleged misconduct is part of the *Brady* claim as well because the nondisclosure is what allowed the prosecution to allegedly mislead the defense and the court.

## II.

### *Habeas Standards*

"Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) "When presented with a petition for a writ of habeas corpus, a court must first determine whether the petition states a prima facie case for relief—that is, whether it states facts that, if true, entitle the petitioner to relief—and also whether the stated claims are for any reason procedurally barred." (*People v. Romero* (1994) 8 Cal.4th 728, 737; *Duvall,* at pp. 474-475.) " 'Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing.' [Citation.]" (*Duvall,* at p. 474.) "If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause]." (*Id.* at p. 475.) "Issuance of an [order to show cause] signifies the court's preliminary determination that the petitioner has pleaded sufficient facts that, if true, would entitle him to relief." (*Ibid.*)

20

"Our standard of review is de novo with respect to questions of law and the application of the law to the facts. We accept as final the superior court's resolution of pure questions of fact if they are supported by substantial evidence. (*In re Collins* (2001) 86 Cal.App.4th 1176, 1181.)" (*In re Richards* (2012) 55 Cal.4th 948, 960.)

## III.

### *Hill Established a Prima Facie Claim under* Napue.

### A. Governing Principles

*Napue, supra,* 360 U.S. 264, reiterated the "established" rules that "a conviction obtained through use of false evidence, known to be such by representatives of the State" violates due process under the Fourteenth Amendment to the United States Constitution, and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (*Napue,* at pp. 265, 269.) *Napue* confirmed that this principle applies to false evidence bearing on the credibility of a witness. (*Id.* at p. 269.) As the California Supreme Court has described the governing rules, "the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. (*In re Jackson* (1992) 3 Cal.4th 578, 595, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6.)" (*People v. Morrison* (2004) 34 Cal.4th 698, 716-717.) "Due process also bars a prosecutor's knowing presentation of false or misleading argument." (*Id.* at p. 717.) " '[A] prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process.' " (*Ibid.,* quoting *People v. Sakarias* (2000) 22 Cal.4th 596, 633.)

Relief for a *Napue* violation requires proof of materiality. (*Panah v. Chappell* (9th Cir. 2019) 935 F.3d 657, 664.) Reversal of the conviction is

21

required if the false evidence used by the prosecution "may have had an effect on the outcome of the trial" (*Napue, supra,* 360 U.S. at p. 272), meaning there is any " 'reasonable likelihood that the false testimony could have affected the judgment of the jury.' " (*Panah,* at p. 664, quoting *Hayes v. Brown* (9th Cir.2005) 399 F.3d 972, 985.) This standard "generally has been equated with the 'harmless beyond a reasonable doubt' standard of *Chapman v. California* (1967) 386 U.S. 18." (*In re Jackson, supra,* 3 Cal.4th 578 . 598, disapproved on other grounds in *In re Sassounian* (1991) 9 Cal.4th [535,] 545, fn. 6 (*Sassounian*); *United States v. Bagley* (1985) 473 U.S. 667, 680, fn. 9 (*Bagley*) [*Napue* standard "is equivalent to the *Chapman* harmless-error standard"].) "[A] *Napue* claim fails if, absent the false testimony or evidence, the petitioner still 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " (*Panah,* at p. 664, quoting *Hayes,* at p. 984.)[12]

---

[12] Hill accuses the People of attempting to "dumb down the constitutional requirements of *Napue* and due process by referring to a California procedural rule that permits a habeas corpus petition predicated upon '[f]alse evidence that is *substantially* material or probative on the issue of guilt or punishment' and 'introduced against a person at a hearing or trial' [§ 1473, subd. (b)(1)]." (Italics added.) According to Hill, the People then "bootstrap[]" the "substantial materiality requirement" to statements in *Sassounian, supra,* 9 Cal.4th at page 546, that "[f]alse evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that '*with reasonable probability* it *could have* affected the outcome . . . .' "

Contrary to Hill's description, *Sassounian* did not "misstate the *Napue* standard for relief." *Sassounian* was discussing the requirements of section 1473, not due process. The People's brief accurately states those statutory requirements separately from the requirements of *Napue,* which the People correctly state requires a showing that there is " 'a reasonable likelihood that the false testimony could have affected the judgment of the jury.' "

**B. The Trial Court's Ruling**

The trial court found Hill failed to establish a prima facie case because he did not show that McCray testified falsely or that there was a reasonable probability the alleged false testimony could have affected the jury. As to the latter, the court rejected Hill's "contention that the colloquy at [Hill's] preliminary hearing, at which McCray invoked his Fifth Amendment privilege, constituted testimony falling within the ambit of *Napue*" and concluded the jury could not have been misled by McCray's testimony because it never heard that testimony. In the trial court's view, "[t]he essence of a *Napue* violation is the presentation of misleading evidence to the jury. None of the allegedly false or misleading information here was presented to the jury." The trial court further found that McCray's statement at the preliminary hearing that he did not receive any promises of leniency " 'in exchange for his testimony' " was not "on its face false" because Hill conceded that exhibit 38 was not an "immunity agreement."

**C. Analysis**

Hill's *Napue* claim is multilayered. First, he argues McCray falsely testified at the preliminary hearing that he was not offered leniency by the prosecution when in fact the prosecution had promised he would not be "charged or tried" for any crimes "arising out of his conduct disclosed to [the prosecutor's] office" during the investigation of this case, and the prosecution knew this testimony was false and did nothing to correct it. Next, the prosecutor falsely represented to the trial court that McCray could be prosecuted as an accomplice or accessory to the murders based on his statement that he provided the gun to Hill knowing that it was to be used in the planned robbery, which led the trial court to uphold McCray's exercise of his privilege against self-incrimination. The prosecutor then refused to give

23

McCray immunity, leading the trial court to find McCray unavailable and rule that his statements to the police incriminating Hill were admissible under the hearsay exception for statements against penal interest. (Evid. Code, § 1230).

In sum, Hill argues that after knowingly presenting false evidence to the judge at the preliminary hearing, the prosecution "leveraged the falsehood" to secure rulings that allowed it to present McCray's unsworn statements to the jury at trial with the defense unable to cross examine McCray as to the benefit he was receiving from the prosecution or any other basis for challenging his credibility.[13]

### 1. Napue *Applies to Use of False Evidence to Obtain a Conviction, Not Solely False Testimony to a Jury.*

The parties agree that the first basis of the trial court's ruling was erroneous, and we concur: To the extent the trial court found Hill failed to state a *Napue* claim because McCray's allegedly false testimony was presented at the preliminary hearing rather than at trial, the court was incorrect. *Napue* and the cases it discussed involved false testimony at trial, but the principle was not limited to this context. Rather, *Napue* held that "a State may not knowingly use false evidence, including false testimony, to

---

[13] Although Hill refers to the prosecution "presenting" false evidence at the preliminary hearing, the allegedly false answers were given on direct examination by the defense. Neither of the parties address whether the prosecutor's obligation to correct testimony he or she knows or should know is false extends to testimony by a witness who initially is called by the defense (such as here, at a preliminary hearing) but later becomes the People's witness at trial. Regardless, Hill alleged, and argues, that the prosecution also "knowingly use[d] false evidence" to obtain his conviction (*Napue, supra,* 360 U.S. at p. 269) by supporting McCray's claimed right to refuse to testify at trial and using his unavailability to justify admission of his unsworn statements to the police, untested by cross examination.

24

obtain a tainted conviction." (*Napue, supra,* 360 U.S. at p. 269.) As the People recognize, "[p]resenting false evidence to secure a conviction at any proceeding violates the principle that a prosecutor's interest 'in a criminal prosecution is not that it shall win a case, but that justice shall be done.' (*Berger v. United States* (1935) 295 U.S. 78, 88; *In re Brown* (1998) 17 Cal.4th 873, 883.)"

Hill alleged that McCray falsely testified at the preliminary hearing that he received no leniency from the prosecution in exchange for his testimony, and exhibit 38 was a promise of leniency given in exchange for McCray's statements incriminating Hill. He further alleged that McCray asserted his privilege against self-incrimination and refused to answer questions about the robbery and murders despite the fact that the district attorney's office had promised not to prosecute him. He alleged that this assertion of privilege allowed McCray and the People to deceptively obtain rulings allowing the People to present McCray's statements incriminating Hill without McCray being subjected to cross examination. If true, these allegations surely described prosecutorial use of false evidence to obtain a conviction even though the jury did not hear McCray's preliminary hearing testimony.

### 2. *The Trial Court Erred in Finding McCray's Preliminary Hearing Testimony Was Not False.*

In finding McCray did not testify falsely at the preliminary hearing, the trial court primarily addressed McCray's denial that he was "promised any kind of leniency by the district attorney's office of Alameda County *if you*

*would have testified* in this particular case." (Italics added.)[14] The trial court emphasized that McCray was asked whether he received any promises of leniency " 'in exchange for his testimony' " and this phrasing was critical to the court's reasoning that because Hill conceded exhibit 38 was not an immunity agreement, McCray's denial was not false.[15] California's immunity

---

[14] The court dismissed two other "allegedly false statements" as "[e]ven less relevant"—McCray's denial that he was promised leniency or immunity by anyone from the Oakland Police Department and the question whether he had received information from his attorneys about potential leniency, which McCray did not answer due to his attorney's sustained objection. Hill does not focus on these statements in his briefing here.

The trial court did not specifically address the other response Hill argues was false—McCray's denial that he had " 'personally had any contact with any members of the Alameda County District Attorney's office.' " Our review indicates that the exhibits to the petition support an inference that McCray personally met with Meloling but fall short of actually demonstrating this fact. Exhibit 42 to the petition does not appear in the record but was described by the trial court as "a memorandum dated September 26, 1985" advising " 'Department #6 Calendar Attorneys' " that "McCray was a witness against [Hill]," that "Assistant District Attorney Meloling agreed to release McCray on his own recognizance 'after he gives a taped statement to [Meloling] on Monday (9/[3]0)' and that " '[McCray] wants immunity before he talks.' " Exhibit 43 consists of prosecutor's notes including, in an entry dated September 26, 1985, "He is our witness vs. Hill 187," and, on September 30, 1985, "[McCray] O.R.'d per Bud Meloling, "[McCray] to keep in contact w/ [Officer] Medsker," and "10/1 . . . Px vacated." This chronology suggests that McCray in fact met with Meloling on September 30, but does not document that he in fact did so. As the trial court observed, "[i]t is not clear from the record whether McCray ever actually gave the taped statement referenced in Exhibit 42."

[15] The trial court observed that "despite what appears to be the contemplation of a possible grant of immunity by the prosecution, the fact that McCray invoked his Fifth Amendment privilege and did not testify against [Hill] strongly suggests that such an agreement was never consummated." The court was referring to exhibit 44 to the petition, a page of district attorney notes that includes a January 14, 1986 entry saying "Also,

26

statute, section 1324, contemplates an exchange of immunity for testimony; it "permits grants of immunity to secure testimony." (*People v. Ervin* (2000) 22 Cal.4th 48, 81.) Specifically, section 1324 provides for court orders compelling testimony, upon request of the prosecution and after a hearing, when a witness refuses to testify on grounds of self-incrimination and is privileged to do so but specifies that "no testimony or other information compelled under the order or any information directly or indirectly derived from the testimony or other information may be used against the witness in any criminal case." "[W]here a witness receives immunity, that witness's testimony is compelled and the witness no longer has a privilege against self-incrimination." (*People v. Morgain* (2009) 177 Cal.App.4th 454, 466.)

The "in exchange for testimony" phrasing of the question McCray was asked is similarly critical to the People's argument that because exhibit 38 was not written to compel testimony, it would not have protected McCray from prosecution if he had testified—in other words, exhibit 38 was not a grant of immunity subject to section 1324. This point is demonstrated, the People maintain, by the fact that McCray's attorney—to whom exhibit 38 was written—advised him to assert his privilege against self-incrimination, which she would not have done if she understood the letter as providing immunity. The People further argue that the promise not to prosecute could not have

_____

per [Meloling] . . . we may give McCray immunity (under [Penal Code section] 1324)." It is clear McCray was not given official immunity pursuant to section 1324—the prosecutor's express refusal to give him immunity was the basis for his assertion of privilege at trial. But we know from exhibit 38, which refers to a "recent conversation [on the] subject," that at some point prior to February 1986 the prosecution *did* assure McCray he would not be prosecuted.

27

been in exchange for testimony because exhibit 38 was written months after McCray made his statements to the police.

Hill does not claim exhibit 38 was an immunity agreement; to the contrary, he expressly states in his briefs that the letter was not an immunity agreement and argues that "[w]hether or not it was a quid pro quo is irrelevant." Hill contends that a promise not to prosecute McCray for any crimes arising from the conduct he described is nevertheless a promise of *leniency,* and that McCray therefore testified falsely when he denied that he was promised "any kind of leniency" by the prosecution.

We agree that a promise not to prosecute McCray for crimes arising from his conduct in relation to this case—conduct the prosecutor at trial expressly stated made McCray an aider and abettor to the offenses—cannot be seen as anything other than *some* form of leniency. But this point does not address the phrasing of the question McCray was asked. Focusing on the literal phrasing, the People argue that McCray's testimony was not false because he incriminated Hill months before Meloling wrote exhibit 38 and, therefore, not *in exchange* for the promise, and because McCray incriminated Hill in statements to the police, not in *testimony.* (*Martin v. Lizarraga* (C.D.Cal. June 2, 2017, No. EDCV 16-1702-AG(KS)) 2017 WL 6883766, at p. *13 [preliminary hearing testimony that police made no promises in exchange for jailhouse statements incriminating defendant not shown to be false by post-trial statement that prosecutor made promises to induce her testimony].) The People's position is that McCray truthfully testified he was not promised leniency "in exchange" for "testimony" even though he did in fact receive leniency after incriminating Hill—he was promised he would not be prosecuted and he was not charged with the offenses in which he implicated himself.

The People's assumption that a promise of leniency can be "in exchange" for a witness's incriminating statement only if the promise precedes the statement is too narrow. Here, the prosecution would not necessarily have been able to use McCray's statements to the police as evidence at trial; they were hearsay. The exhibits to the petition document that the prosecutor wanted more from McCray than the statements he had already given: As of about two weeks after McCray's statements to the police, the district attorney's office wanted to get a statement from McCray and McCray told his attorney he wanted immunity before he would talk. As the trial court noted, "[i]t is not clear from the record whether McCray ever actually gave the taped statement referenced in Exhibit 42." There is no apparent reason the promise not to prosecute McCray could not have been intended to induce him to adhere to his statements in further statements or testimony. Indeed, it is hard to imagine why else the district attorney would have promised not to prosecute McCray.

Even if not technically false, McCray's preliminary hearing testimony was highly misleading, which can be sufficient basis for a *Napue* violation. In *U.S. v. Barham* (5th Cir. 1979) 595 F.2d 231 (*Barham*), critical witnesses for the government in a case in the Northern District of Alabama testified that they had not been promised leniency or other consideration by the prosecuting authorities in return for their testimony against Barham. (*Id.* at p. 239.) In fact, they had received such promises from the prosecutor in the Middle District of Tennessee, as documented in a letter to the prosecutor in Barham's case. (*Ibid.*) *Barham* stated, "The testimony heard by the jury, if not outright lies, certainly conveyed the false impression that none of these three witnesses had received any promises of leniency or other considerations. And the Government, through the prosecuting attorney,

knew that its witnesses had conveyed to the jury something other than the truth." (*Id.* at p. 241.) Applying *Napue* and related cases and explaining that proper evaluation of the witnesses was "especially important" because the case involved two sets of witnesses, all implicated in some stage of the charged criminal enterprise, who "presented irreconcilable stories," *Barham* reversed the judgment. (*Barham,* at pp. 242-243.)

Although the allegedly false testimony in the present case was not presented to the jury, assessment of its falsity is analogous. McCray denied that anyone from the police department promised him any kind of immunity or leniency if he provided a statement, that the district attorney's office promised him any kind of leniency if he testified in this case and that he personally had any contact with any member of the district attorney's office. When Hill's attorney asked McCray whether he had received any information through his attorneys regarding leniency with regard to potential charges in this case, McCray was not required to answer because the trial court sustained McCray's attorney's attorney-client privilege objection. Taken as a whole, McCray's testimony gave the impression he had not been promised or received any form of leniency from the People in connection with this case. (See *Barham, supra,* 595 F.2d at p. 241; *Alcorta v. Texas* (1957) 355 U.S. 28, 31 [finding due process violation where witness's testimony, "taken as a whole, gave the jury [a] false impression"].) This impression was supported by McCray's assertion of his privilege against self-incrimination in response to all questions related to Hill and the August 1985 offenses. Yet some two months before the preliminary hearing, McCray had been assured he would not be prosecuted for any crimes arising from the conduct disclosed to the prosecutor's office during its investigation of this case. The *Barham* court said of one witness's answer to a question, that while "truthful in a narrow,

30

literal sense, its effect was to deny much more than the truth warranted." (*Barham*, at p. 241.) McCray's testimony at the preliminary hearing was of a similar nature.

### 3. *The Petition Sufficiently Alleged that the Prosecution Used False or Misleading Evidence and Argument to Obtain Hill's Conviction.*

Hill's *Napue* claim is based on allegations that the prosecution exploited McCray's misleading testimony and affirmatively misled the court by supporting McCray's assertion of the privilege against self-incrimination, refusing to give him immunity and arguing his statements to the police were admissible due to his unavailability—all without informing the defense or the trial court that the district attorney's office had promised McCray he would not be prosecuted for any crimes arising from the conduct related in his statements. It was not solely McCray's prerogative to claim the privilege. "It is the duty of a court to determine the legitimacy of a witness' reliance upon the Fifth Amendment. *Rogers v. United States,* 340 U.S. 367, 374-375 (1951). A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give." (*Roberts v. U.S.* (1980) 445 U.S. 552, 560, fn. 7.) "As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination." (*Rogers,* at p 374.) Here, when the court at Hill's trial upheld McCray's assertion of the privilege, it did not know the district attorney's office had promised that McCray would not be prosecuted for crimes arising from his statements about the offenses. Defense counsel should have had the opportunity to argue the significance of exhibit 38 with respect to McCray's privilege against self-

31

incrimination and the court should have been able to make an informed decision on any issues raised.

As we have said, the People make no effort to explain the purpose or legal significance of the promise not to prosecute McCray. Although this promise did not satisfy the requirements of the immunity statute, Hill argues that it eliminated the basis for McCray's exercise of the privilege against self-incrimination because McCray faced no risk of prosecution for what he would say in trial testimony. The People assert that McCray had a right to refuse to testify because exhibit 38 did not confer immunity and, absent section 1324 immunity, could not have been compelled to testify. The People do not address whether the promise made in exhibit 38 would have been enforceable if McCray had chosen to testify in reliance on the assurance he was given in exhibit 38.

Recognizing that exhibit 38 was not a grant of statutory immunity, we are not convinced by the People's argument that the district attorney's documented nonprosecution promise was an insufficient basis to reject McCray's invocation of privilege and compel him to testify. Prosecutors' promises of immunity may be binding even if not made in compliance with section 1324. (*People v. Brunner* (1973) 32 Cal.App.3d 908, 914-915; *Griego v. Superior Court* (2000) 80 Cal.App.4th 568, 573.) "Although immunity in a felony proceeding is usually granted by the court following application by the prosecution (Pen. Code, § 1324), the same result is achieved where, as here, the prosecution has obtained testimony under a promise to withhold prosecution. (*Brunner,* [at pp.] 914-915 [district attorney's promise of immunity from prosecution in return for testimony in murder case].)" (*Griego,* at p. 573 [promise of transactional immunity in exchange for deposition testimony in sexually violent predator proceeding].) In *Griego,* the

prosecutor could not have applied for immunity under section 1324 because the statute does not apply to the type of proceeding involved, but the "less formal promise . . . to withhold prosecution" was nevertheless within the prosecutor's authority and binding. (*Griego,* at pp. 574-575.) In *Brunner,* although the prosecutor who offered immunity in exchange for the witness's testimony in a murder case did not comply with section 1324, when the witness was later indicted for that murder, the prosecution was estopped from arguing noncompliance with section 1324. (*Brunner,* at p. 915 ["It would be anomalous to permit the People, represented by the district attorney, to argue that an earlier agreement entered into by the district attorney was void for lack of compliance with a statute of whose existence the district attorney must have been aware"]; see *People v. Superior Court* (*Perry*) (1989) 213 Cal.App.3d 536, 540 [prosecutor's offer of immunity without complying with section 1324 enforceable after accepted or relied upon].)

A similar result may follow where an unauthorized promise of leniency causes a witness to give up constitutional rights. *People v. C.S.A.* (2010) 181 Cal.App.4th 773 discussed federal cases holding that while law enforcement officers do not have authority to decide whether to dismiss criminal charges and therefore cannot make an enforceable promise to do so, a defendant's reliance on such a promise may be enforceable in the "narrow" circumstance where the defendant shows "reliance of constitutional consequence implicating due process—for example, where the defendant gives up his right to counsel or right to not incriminate himself on the basis of a promise to dismiss if he cooperates." (*Id.* at p. 779 [promise by police officers enforceable on due process grounds only when the defendant's reliance has constitutional consequence].) We are not concerned with an unauthorized promise, as exhibit 38 was written by the assistant district

attorney, not a police officer. But it is reasonable to apply a similar principle of fundamental fairness where a promise by the authorized governmental officer, although not statutorily enforceable, causes a witness to forfeit his constitutional privilege against self-incrimination.

While these cases are not directly on point, they suggest a degree of flexibility in enforcing due process standards that is not acknowledged in the People's arguments or the trial court's decision. Here, it is difficult not to view the prosecutor's refusal to grant immunity to a witness it has secretly promised not to prosecute as anything other than gaming the system.

In our view, McCray's testimony at the preliminary hearing and the prosecutor's argument to the trial court at the time of trial were sufficiently misleading to be considered false and a due process violation within the meaning of *Napue*. (See *Morrison, supra,* 34 Cal.4th at pp. 716, 717 [prosecution has "duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading"; "[d]ue process also bars a prosecutor's knowing presentation of false or misleading argument"]; *Panah, supra,* 935 F.3d at p. 664 [elements of *Napue* claim are that "the testimony or evidence in question must have been false or misleading[,]" "the State must have known or should have known that it was false or misleading" and "the testimony or evidence in question must be material"]; but cf. *Towery v Schriro* (9th Cir. 2010) 641 F.3d 300, 309 (*Towery*).) [16] The petition alleged

_____

[16] *Towery v Schriro* noted that not all courts recognize misleading evidence as false under *Napue*. (*Towery, supra,* 641 F.3d at p. 309.) *Towery* observed, "There is some support for Towery's view that accurate testimony could be delivered in a sufficiently misleading context to make the evidence false for *Napue* purposes. *Compare United States v. Vozzella,* 124 F.3d 389, 390 (2d Cir.1997) (recognizing that *Napue* applied to 'the use of evidence that was in part false and otherwise so misleading as to amount to falsity'), *and*

34

that the prosecutor used McCray's false or misleading testimony and its own false or misleading argument to obtain Hill's conviction.

The trial court dismissed Hill's petition for failure to state a prima facie claim. At this stage, Hill was not required to *prove* his allegations, only to demonstrate that a claim would be stated if the allegations were true. The People dismiss Hill's allegations that McCray testified falsely as conclusory and therefore insufficient to state a prima facie case. As earlier noted, " '[c]onclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing.' [Citation.]" (*Duvall, supra,* 9 Cal.4th 464, 474.) But Hill *did* explain the basis for his allegations that McCray's testimony was false. Considering the totality of Hill's allegations and the documentation the People so belatedly turned over, the trial court erred in finding Hill failed to establish a prima facie case on his *Napue* claim on the basis that he did not show McCray testified falsely. The remaining question is whether Hill met his burden of showing materiality.

### 4. *Hill Established a Prima Facie Case of Materiality.*

As earlier noted, the *Napue* materiality standard requires reversal of a conviction there is any " 'reasonable likelihood that the false testimony could

---

[*Barham, supra,*] 595 F.2d [at pp.] 240-[2]41 (holding evidence was false when witnesses testified they had not been offered leniency by 'any of the attorneys' or 'anybody in the Northern District of Alabama,' but had in fact received promises from other authorities), *with Byrd v. Collins,* 209 F.3d 486, 517 (6th Cir.2000) (noting that 'in order to establish a claim of prosecutorial misconduct or denial of due process, . . . the defendant must show that the statement in question was "indisputably false," rather than merely misleading.' (quoting *United States v. Lochmondy,* 890 F.2d 817, 823 (6th Cir.1989)))."

35

have affected the judgment of the jury.' " (*Panah, supra,* 935 F.3d at p. 664, quoting *Hayes v. Brown, supra,* 399 F.3d at p. 985.) This standard is equivalent to the harmless beyond a reasonable doubt standard for determining whether constitutional error is prejudicial. (*In re Jackson, supra,* 3 Cal.4th 578, 598; *Bagley, supra,* 473 U.S. at p. 680, fn. 9.) "A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only 'prosecutorial misconduct,' but also 'a corruption of the truth-seeking function of the trial process.' " (*Barham, supra,* 595 F.2d at p. 242, quoting *United States v. Agurs* (1976) 427 U.S. 97, 104 (*Agurs*).) "[A] *Napue* claim fails if, absent the false testimony or evidence, the petitioner still 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " (*Panah,* at p. 664, quoting *Hayes* at p. 984.)

### a. Disclosure of Exhibit 38 Could Have Affected How the Case Was Presented to the Jury.

The trial court did not meaningfully address materiality in the context of Hill's *Napue* claim because it concluded McCray's testimony was not false and was not presented to the jury. As we have discussed, the former conclusion was erroneous at the prima facie stage of these proceedings and the latter was based on an improperly narrow interpretation of *Napue* error. Hill argues there is a reasonable likelihood the jury's verdict could have been affected if McCray had not falsely denied receiving leniency or the prosecution had corrected the misimpression that McCray had a valid basis for refusing to testify. The People, aside from asserting no false evidence was presented to the jury, maintain that even if exhibit 38 had been disclosed, there is no reasonable likelihood the prosecution would have granted McCray immunity and "the trial would have proceeded exactly as it did."

36

We disagree. We can assume it is likely McCray would have asserted his privilege against self-incrimination even if exhibit 38 had been disclosed and McCray had not denied being promised leniency; as it was, McCray claimed the privilege under the advice of his attorney, who obviously knew of exhibit 38 since she was its recipient. Nevertheless, there are multiple ways the trial and jury's verdict could have been affected.

As we have said, the People do not explain what appears to us the obvious inconsistency between the prosecution's promise not to prosecute McCray for the crimes in which he incriminated himself and its refusal to grant him immunity. The prosecution cannot be compelled to grant immunity to a witness whose testimony is sought by the defense. (*In re Williams* (1994) 7 Cal.4th 572, 609-610.) But McCray was a *prosecution* witness at trial, and the result of his assertion of privilege and the prosecution's refusal to grant him immunity was to allow the jury to hear his unsworn statements to the police with no opportunity for the defense to cross examine him. While "a defendant's constitutional right to confront witnesses against him does not supersede a witness's constitutional privilege against self-incrimination" (*People v. Smith* (2007) 40 Cal.4th 483, 521; *Hill, supra,* 3 Cal.4th at p. 993), such a major intrusion into defense rights calls for some degree of certainty that the privilege claim is valid. Here, the prosecutor led the trial court to believe there was no reason to question McCray's assertion of privilege or the People's denial of immunity.

The very fact that exhibit 38 was suppressed causes us to question whether the People would have denied immunity if the defense and the court were aware McCray had been assured he would not be prosecuted. If McCray had been granted immunity or the court had rejected his privilege claim and McCray testified consistent with his statements to the police, the defense

37

would have been able to challenge his credibility in multiple ways, including questioning the details of his testimony, his self-interest in testifying for the prosecution, and matters such as his criminal history and drug use. As we will explain, there is at least a reasonable likelihood that undermining McCray's credibility could have affected the jury's verdict notwithstanding the other evidence against Hill.

Of course, the trial court would have upheld McCray's claim of privilege despite exhibit 38 if the prosecution had refused to grant immunity and the court concluded the letter did not fully protect McCray. The trial court's authority to reject an assertion of the privilege against self-incrimination is limited: "[A] trial court may deny Fifth Amendment privilege only if it is ' "perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency" to incriminate.' ([*Hoffman v. United States* (1951)] 341 U.S. [479,] 488, italics omitted.) . . . [T]he Fifth Amendment does not allow 'the court to assess the likelihood of an actual prosecution in deciding whether to permit the privilege.' ([*People v.*] *Seijas* [(2005)] 36 Cal.4th [291,] 305; see Evid. Code, § 404.)" (*People v. Capers* (2019) 7 Cal.5th 989, 1011.)

Assuming the trial court upheld the privilege despite exhibit 38 and McCray's statements to the police were admitted, the trial would not necessarily have proceeded the same way. As we have said, at the actual trial, the defense as well as the prosecution sought admission of McCray's self-incriminating statements, thus indicating the defense believed McCray's statements would "help exculpate" Hill. (*Hill, supra,* 3 Cal.4th at pp. 995-996.) But defense counsel's calculation of risks and benefits to admission of the statements might well have been affected by awareness of exhibit 38. In argument to the jury, defense counsel commented that although he would

38

have liked to cross examine McCray, McCray had a right to invoke the Fifth Amendment and that the jury was allowed to hear his statements to the police because the law considers such self-incriminating statements sufficiently likely to be true. Counsel questioned why McCray was not prosecuted despite his admission of complicity as at least an aider and abettor but told the jury this was the prosecutor's decision and not something for the jury to consider; indeed, defense counsel made a point of commending the prosecutor, saying he had "not lied" or "twisted the facts" and had been "fair." It is doubtful counsel would have approached these issues the same way if he had known the truth: that the district attorney's office had *assured* McCray he would not be prosecuted.

Had the defense opposed admission of McCray's statements as unreliable due to his self-interest or violative of Hill's right to confrontation in light of the assurance he would not be prosecuted, the trial court would have been called upon to exercise its discretion as to whether the statements should be admitted. A statement offered as against the declarant's penal interest may properly be excluded as "insufficiently trustworthy and therefore unreliable." (*People v. Masters* (2016) 62 Cal.4th 1019, 1057; *People v. Smith* (2017) 10 Cal.App.5th 297, 304 [defendant's girlfriend's statement taking responsibility for car accident long afterward unreliable due to relationship and inconsistency with statement at time of accident].) "[T]he rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements. (*People v. Spriggs* (1964) 60 Cal.2d 868, 874.)" (*People v. Grimes* (2016) 1 Cal.5th 698, 711.) But circumstances may show that the assumption underlying this

39

hearsay exception is unwarranted. *Masters,* for example, rejected the argument that an inmate who incriminated himself in a conspiracy to murder a correctional officer would not have done so falsely, noting that the inmate "could have decided to provide false statements to prison officials for various possible reasons—for example, in exchange for a benefit, to weaken the prosecutor's case against his fellow gang members by spreading disinformation, or because he thought the statements would convince the prison authorities about his desire to leave the [gang]." (*Masters,* at p. 1057.)

Here, there was already reason to question the reliability of McCray's statements in that although self-incriminatory in acknowledging McCray's involvement in criminal conduct, the statements were also exculpatory in that they assigned primary blame and intent for the robbery and murders to Hill. *People v. Duarte* (2000) 24 Cal.4th 603 observed that "the entire rationale underlying the against penal interest hearsay exception 'breaks down in a situation where a declarant in police custody seeks to exculpate himself by implicating another suspect.' (*People v. Campa* [(1984)] 36 Cal. 3d [870,] 882; see also *People v. Shipe* [(1975)] 49 Cal. App. 3d 343,] 354 [postarrest statement admitting some complicity but ascribing greater culpability to coparticipant lacks indicia of reliability].)" (*Id.* at p. 618.) In that case, the declarant's post-arrest statements to the police, while self-incriminatory, "unmistakably also were 'attempts to shift blame or curry favor' (*Williamson v. United States* [(1994)] 512 U.S. [594,] 603) with the authorities." (*Duarte,* at pp. 614-615.) There, the declarant admitted participating in a drive-by shooting but "tended sympathetically to describe [his] participation in the shooting . . . , to minimize his responsibility for the injuries caused thereby and to imply that others who were or might become implicated should bear a greater share of the responsibility." (*Id.* at pp. 611-

40

613.) Since the declarant was under arrest, knew physical evidence linking him to the crime had been found at his residence, and had been told cooperation might help him, he "may have believed . . . he had little to lose and perhaps something to gain by admitting his role while attempting to minimize his participation and shift primary responsibility to others." (*Id.* at p. 617.)

Here, with spent shells and what appeared to be stolen jewelry found in his possession, McCray had every reason to attempt to deflect responsibility for the offenses onto Hill, thus inherently reducing the reliability of his statements. Exhibit 38 would have further undermined any inference of reliability. Additionally, while the letter was written subsequent to McCray's statements to the police, the reference in exhibit 38 to "recent discussions" would have given the defense reason to investigate when the police and/or district attorney's office first discussed leniency with McCray and what expectations he had when he gave the statements to the police on the night of his arrest.

Moreover, knowledge that the prosecution was declining to give McCray immunity despite having promised not to prosecute him might well have caused the trial court to question the fundamental fairness of permitting the jury to hear McCray's out-of-court statements when the defense was unable to challenge McCray's credibility through cross examination. In these circumstances, there is a reasonable likelihood the trial court would have exercised its discretion to exclude the statements even if McCray was unavailable as a witness.

Finally, assuming McCray's statements were admitted, disclosure of exhibit 38 would have strengthened the defense's ability to challenge the credibility of the statements incriminating Hill as influenced by McCray's

41

self-interest in assisting the prosecution. (Evid. Code, § 1202 ["Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing"].) McCray's statements were strong evidence against Hill because they provided a full narrative and motivation for the offenses; they were convincing because McCray would not be expected to falsely incriminate himself. While the jury at the actual trial was aware that McCray had not been arrested and was not being prosecuted despite his admitted role in the offenses, and this information *suggested* McCray must have had some reason to believe he would be treated favorably by law enforcement, exhibit 38 *proved* he was in fact promised he would not be prosecuted.

### b. Disclosure of Exhibit 38 Could Have Affected the Jury's Evaluation of the Evidence.

In the context of Hill's *Brady* claim, the trial court concluded there was not a reasonable probability of a different result if exhibit 38 had been disclosed (the *Brady* standard of materiality) because the evidence against Hill was overwhelming. The People point out that on Hill's direct appeal, the Supreme Court found any error in admitting McCray's statements to the police was harmless beyond a reasonable doubt (*Hill, supra,* 3 Cal.4th at pp. 995-996)[17] and argue this means there is no reasonable probability

---

[17] The Supreme Court's discussion was in the context of a claim that admission of McCray's statements at trial violated Hill's constitutional rights of confrontation and cross-examination under *Bruton v. United States* (1968) 391 U.S. 123, 126-127, and *People v. Aranda* (1965) 63 Cal.2d 518, 528-530, which concerned the principle that " '[a] nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant *is generally unreliable and hence inadmissible* as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" (*Hill, supra,* 3 Cal.4th at pp. 994, 995-996.)

further impeachment of McCray's statements would have affected the result at trial.[18]

The Supreme Court, of course, considered the question of prejudice in light of the record at trial, without the subsequently disclosed promise not to prosecute McCray or other previously undisclosed evidence of assistance and rewards provided to other witnesses. The trial court considered the potential effect of exhibit 38 on the evidence as described by the Supreme Court. Hill argues that the trial court improperly ignored the additional evidence discovered subsequent to trial that "devastatingly impeach[es]" many of the prosecution witnesses other than McCray "because they all received undisclosed monetary rewards from the County of Alameda for their testimony, received suppressed benefits on pending criminal charges, or had suppressed impeachment evidence on prior convictions." The testimony of these witnesses was critical to corroborate the evidence of McCray's statements because McCray was an accomplice. (§ 1111; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103; CALCRIM No. 334.) Hill argues the

---

[18] The Supreme Court's primary reason for finding any error in admitting McCray's statements was harmless beyond a reasonable doubt was that the defense had sought their admission: "The most telling sign of an absence of prejudice is that [Hill] himself sought to rely on McCray's statements in large part, for the obvious reason that [he] thought they would help exculpate him." (*Hill, supra,* 3 Cal.4th at pp. 995-996.) As the People note, the court also referred to the "extensive" other evidence against Hill, but this was in reference to finding no prejudice in admission of the two statements that were admitted over defense objection—which the court described as "minor exceptions" to defense counsel's active pursuit or acquiescence in admission of "much more extensive and arguably more damaging portions of McCray's statements." (*Id.* at p. 996.) The court did not comment on whether the other evidence against Hill would have been sufficient to find admission of *all* the statements harmless beyond a reasonable doubt.

trial court was required to take as true his allegations and supporting documents concerning this impeachment evidence, which "rebrand the 'overwhelming evidence' as merely a prosecution predicated on *overwhelming lies* involving suppressed enticements, favors, payments, and State deceit required to bolster McCray's lies." The full habeas record, Hill argues, undermines any confidence in the verdict.

The impeachment evidence related to witnesses other than McCray was directly relevant to claims rejected in Hill's previous habeas petitions, and the People argue Hill has offered no authority requiring the trial court to "reconsider all evidence in support of successive and procedurally barred claims in making its materiality determination." Hill's 1998 state habeas petition alleged claims based on the nondisclosure of impeachment evidence related to the various prosecution witnesses; the Supreme Court denied these claims on the merits. In the federal habeas proceedings on the amended petition filed in 2019, the district court found portions of these claims unexhausted because they added allegations and/or evidence not included in the 1998 state petition. The trial court in the present case did not consider these claims on the merits: It found them procedurally barred to the extent they were presented in Hill's first state habeas petition (*Miller, supra,* 17 Cal.2d at pp. 734, 735); to the extent they raised new claims, barred as successive because Hill did not adequately justify his failure to raise them earlier (*In re Friend, supra,* 11 Cal.5th at p. 741); or, to the extent they were based on evidence that could not have been presented earlier, barred because they would not demonstrate actual innocence or ineligibility for the death

44

penalty. (§ 1509, subd. (d).)[19] We denied Hill's request for a certificate of appealability as to these claims.

Hill's claims of *Brady* violations based on the alleged suppression of impeachment evidence related to prosecution witnesses other than McCray thus are not before us. Still, the petition "incorporate[d] by reference each and every paragraph of this Petition in each and every claim presented as if fully set forth therein," making the allegations pertaining to suppression of other-witness impeachment evidence part of the *Napue* and *Brady* claims based on suppression of exhibit 38. In analyzing the materiality element of Hill's *Napue* claim, if we consider only whether there is any reasonable likelihood that disclosure of exhibit 38 could have affected the jury's verdict in light of the trial record alone, we ignore the possibility that other suppressed impeachment evidence might have altered the jury's view of the evidence supplied by witnesses other than McCray.

Of course, it would not be appropriate to consider this other impeachment evidence if the *Brady* claims Hill asserted based on that

---

[19] Section 1509, subdivision (d) provides, as pertinent here: "An initial petition which is untimely under subdivision (c) or a successive petition whenever filed shall be dismissed unless the court finds, by the preponderance of all available evidence, whether or not admissible at trial, that the defendant is actually innocent of the crime of which he or she was convicted or is ineligible for the sentence."

These limitations on successive petitions "do not limit the consideration of claims that could not reasonably have been raised earlier, such as those based on newly available evidence or on recent changes in the law . . . . [H]abeas corpus petitioners must make a showing of actual innocence or death ineligibility if they seek a second chance to make an argument they could have made earlier. No such requirement applies to the habeas corpus petitioner who raises a newly available claim at the first opportunity." (*In re Friend, supra,* 11 Cal.5th at p. 724.)

evidence had previously been denied for failure to establish the evidence was not subject to *Brady* or was not suppressed. But this does not appear to be the case: Since the alleged material was clearly relevant to impeachment, and *Brady* applies to impeachment evidence (*Bagley, supra,* 473 U.S. at p. 676), we infer that the Supreme Court's denial of these claims on the merits was due to lack of materiality. In other words, we assume the Supreme Court concluded there was not a reasonable probability that the additional impeachment of these other witnesses would have resulted in a more favorable verdict for Hill. However, that conclusion was necessarily reached on a record that included the evidence of McCray's statements incriminating Hill and did *not* address the subsequently discovered suppression of exhibit 38. The Supreme Court did not have occasion to consider the cumulative effect of all the improperly suppressed evidence, including exhibit 38.

We do not revisit Hill's *Brady* claims related to witnesses other than McCray. The question before us is one of materiality: whether there is a reasonable likelihood that the false or misleading testimony and argument related to McCray and exhibit 38 could have had an effect on the outcome of trial. (*Panah, supra,* 935 F.3d at p. 664.) Materiality "must be judged in the context of the entire record." (*Brown v. Borg* (9th Cir. 1991) 951 F.2d 1011, 1016-1017; *Agurs, supra,* 427 U.S. at p. 112.) A fair evaluation of materiality in this context requires us to consider the effect of the *Napue* violation in combination with the effects of other improperly withheld evidence that (as we will explain) could have significantly undermined the credibility of many of the prosecution witnesses and, therefore, the overall strength of the case

46

against Hill."[20]  We conclude it is appropriate to determine whether there is a reasonable likelihood that McCray's false or misleading preliminary hearing testimony and its use by the prosecution could have affected the jury's verdict in light of all the facts that would have come to light if the People had not failed to disclose any of the impeachment evidence as Hill asserted in his current petition.

As discussed, Hill made a prima facie showing that if exhibit 38 had been disclosed and McCray had not testified falsely at the preliminary hearing, there is a reasonable likelihood McCray could have testified at trial or, if he did not, his statements to the police could have been excluded or their credibility challenged.  At minimum, exhibit 38 would have enabled the defense to argue that McCray's statements were motivated by extreme self-interest, namely avoiding prosecution for committing the murder himself.  If McCray had testified, Hill argues, the defense would have been able to fully cross examine him not only about his cooperation with law enforcement but also about the details of his account of the charged offenses, including his possession of the three spent shell casings and jewelry from the robbery, but also about other matters bearing on his credibility, such as his history of prior violent criminal acts, convictions, and drug addiction.[21]  In addition, the jury would have been able to observe McCray's "intimidating appearance and

---

[20]  The parties have cited no case law addressing this issue, and we are aware of none.

[21]  Hill argues that McCray could have been impeached with the alleged fact that he took two polygraph examinations over the course of his police interview, failed both, and never passed a polygraph examination.  He cites no supporting documentation.  We are aware that one of the transcripts of a recorded portion of McCray's interview refers to him having taken a polygraph, but it says nothing about the results of that examination.

demeanor," which would bear on Hill's defense that McCray was the actual killer and that Hill only participated at all out of fear of McCray.[22]

The jury did receive some evidence bearing on McCray's credibility. The parties stipulated that he was in federal custody for felony drug offenses not related to the present case. The parties also stipulated that he was not arrested or prosecuted in the present case, meaning the jury knew he had not faced criminal liability despite telling the police he provided Hill with a gun knowing it was to be used in a robbery. The trial court informed the jury that McCray had been called as a witness outside the presence of the jury and, on the advice of counsel, refused to testify based on his privilege against self-incrimination. The jury knew that he possessed weapons and ammunition and was willing to facilitate an armed robbery by providing Hill with a gun for that purpose, the prosecutor acknowledged that McCray was an accomplice, and the jury was instructed that an accomplice's testimony should be viewed with distrust.

Still, the ability to cross examine McCray would have allowed the defense to pursue questions it was only able to speculate about at trial, not least the question why McCray was not prosecuted despite significant evidence suggesting his involvement. As we have said, while the jury's awareness that McCray was not being prosecuted despite the prosecutor's assertion that he aided and abetted the robbery and murders provided a basis for inferring McCray must have had an interest in assisting the prosecution,

---

[22] Hill testified at trial that McCray was about six foot three, was a "pretty thick guy up top, big arms . . . prison buff," with a "big chest" and "full beard." According to the declaration of a friend of McCray's that was submitted with Hill's 1998 habeas petitions, McCray "had a reputation as a dangerous man," weighed 220 to 230 pounds, was over six feet tall and "was a tough person."

48

exhibit 38 would have established McCray's self-interest with solid evidence. Questioning McCray about his criminal history (including convictions for violent offenses and major drug offenses) and possession of weapons would have enhanced the ability of the defense to portray McCray as more likely to have committed the murders than Hill, who the defense attempted to characterize as a "hustler," not a "robber or a killer."

As the People point out, the prosecutor argued to the jury that the evidence against Hill was overwhelming even without McCray's statements. Two jailhouse informants, Allen and Turner, and to a lesser extent Wilkins and Bennett, testified that Hill admitted committing the offenses. Other witnesses heard Hill say he was planning a robbery, saw him with a gun before or after the offenses, and/or saw him with a large amount of jewelry and cash afterward.

McCray's statements, however, provided the only first-hand account of Hill's conduct and motivation for the offenses.[23] The latter is particularly significant. Although, the jury could have found Hill guilty of first degree murder as an aider and abettor of the robbery even if it believed McCray was

---

[23] Houston testified that Hill said he was going to commit the robbery because he was tired of being broke. This motive, however, fails to account for McCray's providing the gun and being found in possession of the spent shells and jewelry. McCray's explanation that Hill needed to repay a drug debt to him appears to better explain the evidence, as well as provide a more compelling motivation to commit these crimes against Hill's friend. At the same time, McCray's story raises questions such as why he would have accepted a small amount of cash plus jewelry in payment of the debt when Hill was in possession of much more cash that could have paid the debt directly. This is the sort of question that might have raised skepticism in jurors apprised of the fact that McCray faced no risk of prosecution for his role in the offenses.

the actual killer, evidence of Hill's intent to kill was critical to proof of the felony-murder special circumstance that made this a capital case—a point the defense made clear in closing argument. (*People v. Mil* (2012) 53 Cal.4th 400, 408 [prior to 1990 expansion of § 190.2, felony-murder special circumstance "applied only to the actual killer or to an aider and abettor who intended to kill"].) Much of the witness testimony and other prosecution evidence was consistent with Hill intending to participate in the robbery but *not* intending that anyone be killed. McCray's account made the robbery Hill's idea, motivated by his need to repay a drug debt to McCray, thereby increasing the likelihood jurors would conclude Hill harbored an intent to kill.[24] The ability to challenge McCray's credibility through cross-examination was thus critical to Hill's ability to avoid a death sentence.

---

[24] Notably, due to changes in the law since Hill's trial, he would potentially be entitled to relief if the jury found he was not the actual killer and did not intend to kill. (§ 1172.6.) Pursuant to statutory amendments by Senate Bill No. 1437 (2017-2018 Reg. Sess.), effective January 1, 2019, felony-murder liability is limited to "(1) 'actual killer[s]' (§ 189, subd. (e)(1)); (2) those who, 'with the intent to kill,' aided or abetted 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)); and (3) 'major participant[s] in the underlying felony' who 'acted with reckless indifference to human life' (*id.*, subd. (e)(3))." (*People v. Wilson* (2023) 14 Cal.5th 839, 868-869.) In addition, by requiring that, to be convicted of murder, a principal in a crime must act with malice aforethought and that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime" (§ 188, subd. (a)(3)), Senate Bill No. 1437 (2017-2018 Reg. Sess.) "eliminate[d] natural and probable consequences liability for first and second degree murder." (*People v. Gentile* (2020) 10 Cal.5th 830, 849.) Section 1172.6 provides a procedure for "those convicted of murder under prior law to seek retroactive relief" (*Wilson,* at p. 869), "no matter how long ago they were convicted, if certain conditions are met." (*People v. Duchine* (2021) 60 Cal.App.5th 798, 809.) This opportunity is not unavailable even where, as here, the felony-murder special circumstance was found true by a jury but at a time before our high Court raised the threshold for such findings

Hill denied making the confessions and other statements attributed to him and offered explanations for his possession of the jewelry and cash after the offenses. His defense may not have been particularly credible, but it was not inherently less credible than McCray's account of Hill robbing and killing a long-time friend and the friend's young child over a $600 drug debt. Some of the witnesses' testimony was consistent with Hill's story, such as the several who described McCray coming to the house on the night of the robbery and murders, looking for Hill saying he "wanted his shit" (*Hill, supra*, 3 Cal.4th at p. 978), which could be seen as supporting Hill's testimony that McCray gave him the gun and jewelry to keep for him after the offenses. Importantly, the jury knew the police and prosecutor had decided to charge and prosecute Hill, not McCray, for these offenses, which would have tended to bolster McCray's credibility in jurors' eyes. The other witnesses corroborated aspects of McCray's story, providing further basis for the jury to believe it.

However, the jury was deprived of impeachment evidence that could have made a difference. It is true that none of the prosecution witnesses were particularly credible: All were drug users and had criminal records or were facing charges; there were inconsistencies between the details of various witnesses' accounts,[25] and some of the details of the jailhouse informants'

---

in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522.

[25] For example, Dartez did not see Hill at the house at the time Wilkins and Houston said Hill made the comments they described about wanting ammunition for a .38 and going to get his gun. Daniels testified neither she nor McCray left their apartment all day on August 15, and specifically that she did not go to the house, but Dartez testified that Daniels came to the house 3:30 or 4:00 p.m. and then left with Hill.

accounts of Hill's statements to them were inconsistent with the police evidence.[26] Defense counsel argued these points at trial and the jury convicted Hill nonetheless. In particular, defense counsel argued that the jail house informants' testimony was entirely lacking in credibility, not only because of inconsistent details but due to the obvious self-interest of these witnesses. However, defense counsel was unable to make the same point with respect to the other prosecution witnesses because counsel did not know about the monetary and other assistance they had been promised or had received from the prosecution. If the jury had known McCray avoided prosecution for the murder through the quid pro quo of testifying against Hill, it likely would have viewed McCray's statements with greater skepticism. Further, to the extent other witnesses corroborated McCray's story, the jury would likewise have been more skeptical of their testimony if it had known they were offered or provided leniency and/or money for their testimony.

For example, Houston acknowledged at trial that she was at that time in custody on a violation of probation for a December 1985 conviction of selling cocaine, and that around the time of the offenses she got high multiple times a day. According to Hill's allegations and supporting documentation, however, the prosecution failed to disclose that prior to Houston testifying at trial, the prosecutor told her he would "do what he could to help resolve" her

_____

[26] As earlier noted, Allen's testimony that Hill told him " 'there was blood all over the counter' at the jewelry store" was contradicted by a police officer's testimony that no blood was found on the counter. (*Hill, supra,* 3 Cal.4th at p. 976.) Turner testified that Hill told him he used a .357 magnum in committing the offenses, which was the type of weapon Turner said Hill had previously tried to sell him, but the evidence showed the murders were committed with a .38-caliber gun.

pending legal problems; she was told, " 'if "you help us and we'll help you," ' "
and, at the time she testified, she "believed that she had been assisted by the
prosecutor" with arrests for "vehicle tampering or vehicle theft" and for
"possession of drug paraphernalia." Shortly after Houston testified,
misdemeanor theft charges against her were dismissed on the prosecutor's
motion, and, although the probation department wanted her to serve jail
time, the prosecutor obtained her release from custody and termination of her
probation.

Similarly, Hill alleged that the prosecution failed to disclose evidence of
Dartez's criminal history and favorable treatment he received from the
prosecutor in Hill's case. According to Hill's allegations, on September 14,
1987, two days before testifying at Hill's trial, Dartez was arrested in San
Francisco on charges of possession of cocaine for sale and felon in possession
of a gun. At that time, Dartez was on probation for a 1986 Alameda County
conviction of possession of a controlled substance and had recently served
about a month in jail on a probation revocation. Hill alleged (based on a
declaration Dartez gave in 1996) that the prosecutor in his case personally
picked Dartez up from the San Francisco Police Department and brought him
back to Alameda County to testify at trial, that Dartez believed at the time
he testified that the prosecutor had intervened to get him out of jail, and that
Dartez was released from custody after he testified. The record reflects that
Dartez was released on his own recognizance on September 16 due to the
subpoena to testify in Hill's trial, and he testified on that date. His case was
continued to January 1988, at which time the case was dismissed.

Hill also alleged that the prosecution failed to disclose that it dismissed
criminal charges against Smith, Wilkins and Daniels. Smith had been
granted diversion in August 1984. When she testified at the preliminary

53

hearing in April 1986, Smith admitted using cocaine on August 15, 1985, and heroin on Easter Sunday, which were violations of diversion. In July 1986, the probation department recommended that diversion be terminated and criminal proceedings re-initiated due to Smith's failure to maintain contact with the probation officer and a new arrest for unlawful use of a controlled substance. Diversion was terminated and charges reinstated, but in August 1986 the case was dismissed, apparently in connection with a negotiated disposition in the new case.

In July 1987 (two months before Hill's trial), Wilkins was charged with possession of heroin and released on his own recognizance. Wilkins told Smith to contact the prosecutor and on July 30 the charges were dismissed on the prosecutor's motion. When Wilkins testified at Hill's trial, he believed he had been released from jail due to Smith's contact with the prosecutor and that the case against him had been dismissed due to his cooperation in the Hill case. According to a private investigator's notes regarding an interview with Wilkins in 1992, Wilkins said he had been arrested days before he was due to testify and he believed he was released because he could not testify if he was in jail.

Daniels was arrested for possession of narcotics on August 7, 1987, and charged on August 11, then on August 12 the charges were dismissed for insufficient evidence. Hill alleged the dismissal was "suspect" because the arrest report stated that the arresting officer saw Daniels drop from her clenched right hand a clear zip-lock plastic bag containing a white rock object which the officer picked up and suspected to be rock cocaine.

In sum, in addition to the undisclosed promise not to prosecute McCray, Hill alleged that the prosecution failed to disclose that all of the witnesses who testified that he referred to plans for a robbery (Houston,

Dartez, Daniels) and/or that they saw him with a gun and/or jewelry and cash on the day of the offenses (Houston, Dartez, Smith, Wilkins) received some form of lenience from the prosecutor around the time they testified at the preliminary hearing or at trial, including dismissed criminal charges (Houston, Dartez, Wilkins, Smith, Daniels) and/or release from custody (Dartez, Wilkins). Also unbeknownst to the defense or jury, each of these witnesses received reward money subsequent to trial in amounts based on information provided by the prosecutor as to their contributions to the case and, it appears, reflecting the extent and specificity of their incrimination of Hill.[27]

Promises or expectations of favorable treatment may give witnesses' "a direct, personal stake in [the defendant's] conviction" and "incentive to testify falsely in order to secure a conviction." (*Bagley, supra,* 473 U.S. at p. 683; *Napue, supra*, 360 U.S. at p. 270 [jury apprised of fact that prosecutor offered witness consideration for testimony "might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the [prosecutor]"].) Just as McCray's credibility would have been further undermined by exhibit 38, the previously undisclosed evidence that most of the prosecution witnesses received some form of leniency or assistance from the prosecution, as well as monetary rewards for providing information in the case, would have undermined their credibility beyond the impeachment

---

[27] As earlier indicated, the largest sums went to the witnesses who most concretely tied Hill to the offenses: $1,500 to Bennett and $500 each to Allen and Turner, all of whom related Hill having confessed the robbery and murders; $400 each to Wilkins (who testified that Hill said he had robbed a jewelry store and killed someone) and Houston (who testified that Hill said he was going to commit a robbery at the location of Brice's jewelry store), $350 to Daniels and $300 each to Smith and Dartez.

available to the defense at trial. Even if the effect of exhibit 38 would not have been sufficient to overcome all the other evidence against Hill as presented at trial, the combined effect of evidence that almost all of the prosecution witnesses had personal interests in assisting the prosecution would have significantly changed the appearance of the prosecution's case. In these circumstances, we can only conclude there is a reasonable likelihood that disclosure of exhibit 38 and the absence of false or misleading testimony and argument concerning McCray's treatment by the prosecution could have affected the jury's verdict. Hill's allegations, taken as true, make it impossible to conclude that despite the People's use of false evidence, Hill "still 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " (*Panah*, *supra*, 935 F.3d at p. 664, quoting *Hayes*, *supra*, 399 F.3d at p. 984.) Accordingly, Hill established a prima facie case of materiality.

## IV.

### *Hill Established a Prima Facie Claim Under Brady.*

### A. Governing Principles

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' (*Brady*, *supra*, 373 U.S. at p. 87.) The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused ([*Agurs*, *supra*,] 427 U.S. [at p.] 107), that the duty encompasses impeachment evidence as well as exculpatory evidence ([*Bagley*, *supra*,] 473 U.S. [at p.] 676), and that the duty extends even to evidence known only to police investigators and not to the prosecutor (*Kyles v. Whitley* (1995)

514 U.S. 419, 438.)  Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' (*Id.* at p. 433.)" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

" 'There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.)  Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' ([*Agurs*], *supra,* 427 U.S. at p. 112, fn. 20; accord, *U.S. v. Fallon* (7th Cir.2003) 348 F.3d 248, 252.)  Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible (cf. *Wood v. Bartholomew* (1995) 516 U.S. 1, 2), that the absence of the suppressed evidence made conviction 'more likely' (*Strickler, supra,* 527 U.S. at p. 289), or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' (*ibid.*).  A defendant instead 'must show a "reasonable probability of a different result." ' (*Banks v. Dretke* (2004) 540 U.S. 668, 699.)" (*People v. Salazar, supra,* 35 Cal.4th at p. 1043.) " 'The requisite "reasonable probability" is a probability sufficient to "undermine[ ] confidence in the outcome" on the part of the reviewing court.' ([*Sassounian*, *supra,*] 9 Cal.4th [at p.] 544.)" (*Id.* at p. 1050.)

**B. The Trial Court's Ruling**

The trial court found that Hill met the first two requirements for a *Brady* violation in that exhibit 38 was "clearly impeachment material as to McCray and therefore 'favorable to the defense" and "the People do not appear to contest that the agreement was not disclosed to the defense until

57

2007." The court found Hill did not establish a prima facie case, however, because the evidence against him at trial was "so overwhelming that the failure to disclose the non-prosecution agreement does not undermine this court's confidence in the verdict." The court found there was not "a 'reasonable probability that, had [the suppressed non-prosecution agreement of McCray] been disclosed to the defense, the result . . . would have been different' ([*Bagley*], *supra,* 473 U.S. at 682)" or "that the withheld evidence 'put[s] the whole case in such a different light as to undermine confidence in the verdict.') (*Kyles v. Whitley* [(1995)] 514 U.S. [419,] 435.)"

The court additionally stated that it was "hardly clear" disclosure of the non-prosecution letter "would have altered the course of [Hill's] trial in any way." The court stated, "The prosecution's express opposition to a grant of immunity for McCray despite the existence of the non-prosecution agreement is strong evidence that the agreement did not confer immunity, and it is difficult to see how disclosure of that document to the defense would have altered the prosecution's position in that regard. Put another way, it is reasonable to conclude that whether or not the document had been disclosed to the defense, the prosecution would have opposed immunity, McCray would have invoked his Fifth Amendment privilege, and the trial would have proceeded in the same fashion as it did."

**C. Analysis**

Hill contends the trial court applied the wrong standard for determining materiality under *Brady* and, as with his *Napue* claim, erred in evaluating materiality based solely on the trial record and in finding he failed to make a prima facie case. As our discussion of the *Napue* claim should make evident, we agree with Hill that materiality must be assessed based in light of all the facts alleged as part of Hill's *Brady* claim, not limited to the

58

trial record and we disagree with the reasoning the trial court expressed in finding Hill failed to show that disclosure of exhibit 38 would have affected the course of Hill's trial. We are not persuaded by Hill's argument that the trial court applied the wrong standard for determining *Brady* materiality, but we nonetheless disagree with the court's conclusion that he failed to make a prima facie case of materiality.

### 1. Brady *Materiality Standard*

Hill contends the trial court erroneously applied the materiality standard stated in *Bagley,* asking whether there was a " ' "reasonable probability" ' " the result " ' "would have been different" ' " if exhibit 38 had been disclosed. He maintains the court should have applied the standard set forth in *Agurs, supra,* 427 U.S. 97, which Hill describes by quoting the *Agurs* court's statement that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." (*Id.* at p. 106.)

*Agurs* described three situations involving prosecutors' nondisclosure of evidence favorable to the defense, with differing materiality standards: Materiality is easiest for the defense to demonstrate where the prosecution knowingly uses perjured testimony or fails to disclose that false evidence was used to obtain the conviction; most difficult for the defense when the defense did not request disclosure or made only a general request; and somewhere in between when the prosecution failed to respond to a specific request. (*Agurs, supra,* 427 U.S. at pp. 103-107, 111-113.)[28] The Court pointed to *Brady* as

---

[28] *Agurs* explained that where a prosecutor knowingly uses perjured testimony or fails to disclose that false evidence was used to obtain the conviction, the conviction " 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the

illustrating the "pretrial request for specific evidence" situation. (*Agurs,* at p. 104.)

Bagley discussed the three situations described in *Agurs* and the Court's subsequent reformulation of "the *Agurs* standard for the materiality of undisclosed evidence" in cases outside the *Brady* context and held that a single materiality test is "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused." (*Bagley, supra,* 473 U.S. at pp. 681, 682.) Contrary to the distinctions drawn in *Agurs*, in all three of these situations the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*Bagley,* at p. 683.)[29]

---

jury.' " (*Bagley, supra,* 473 U.S. at p. 678, quoting *Agurs, supra*, 427 U.S. at p. 103.) This standard "is equivalent to the *Chapman* [*v. California* (1967) 386 U.S. 18] harmless-error standard." (*Bagley,* at p. 679, fn. 9.) Where there is no defense request or only a general one, as was the case in *Agurs*, the standard of materiality is "stricter than the harmless-error standard but more lenient to the defense than the newly-discovered-evidence standard." (*Bagley,* at p. 681; *Agurs,* at pp. 111-112.) Where the prosecution fails to disclose evidence responsive to a specific request from the defense, the *Agurs* court "did not define the standard of materiality" applicable "but suggested that the standard might be more lenient to the defense than in the situation in which the defense makes no request or only a general request" and noted that " '[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.' " (*Bagley,* at p. 681, quoting *Agurs,* at p. 106.)

[29] Hill quotes the *Bagley* court's discussion of the significance of the prosecution's failure to respond to a specific discovery request but fails to acknowledge the court's conclusion that this situation does *not* require a

Hill argues that *Bagley* "applies to very narrow factual circumstances" and the "general *Brady* standard," as set forth in *Wearry v. Cain* (2016) 577 U.S. 385 (*Wearry*), is "the same *Brady* materiality standard used in *Napue/Mooney/Giglio*—is there any reasonable likelihood that it could have affected the judgment of the jury?"[30]  He urges that " '[l]ikelihood' and 'could have' make the threshold for relief near nil, and the threshold for prima facie case review lesser yet."

We are aware of no basis for viewing the *Bagley* standard of materiality as narrowly applicable only to the facts of that case.  To the contrary, *Bagley* is commonly cited as stating the proper standard for assessing materiality of *Brady* material.  (E.g., *Turner v. U.S.* (2017) 582 U.S. 313, 324 (*Turner*); *Kyles v. Whitley* (1995) 514 U.S. 419, 433-434 (*Kyles*).)  Although *Wearry*

different standard of materiality.  (*Bagley, supra,* 473 U.S. at pp. 682-683.) Responding to the Government's suggestion "that a materiality standard more favorable to the defendant reasonably might be adopted in specific request cases," *Bagley* agreed that "an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist," which might cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued."  (*Id.* at p. 682.)  But the Court concluded:  "This possibility of impairment does not necessitate a different standard of materiality, however, for under the *Strickland* formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.  The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."  (*Id.* at p. 683.)

[30] *Mooney v. Holohan* (1935) 294 U.S. 103, *Giglio v. U.S.* (1972) 405 U.S. 150.

61

initially recited the *Napue* formulation to describe when *Brady* evidence is "material," the Court went on to state—consistent with *Bagley, supra,* 473 U.S. at p. 682—that the defendant "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." (*Wearry, supra,* 577 U.S. at p. 392.) Since *Wearry,* the Court has applied the test for *Brady* materiality as stated in *Bagley.* (*Turner,* at p. 324.) As some federal courts have observed, *Wearry* was a per curiam summary reversal decided without oral argument—an unlikely context for the Court to change the long-standing materiality standard for *Brady* evidence. (*Juniper v. Davis* (4th Cir. 2023) 74 F.4th 196, 212, fn. 14; *Prystash v. Davis* (5th Cir. 2017) 854 F.3d 830, 838, fn. 6; see *U.S. v. Ausby* (D.C.Cir. 2019) 916 F.3d 1089, 1093, fn.1 [noting distinction between *Napue* and *Brady* materiality after *Wearry*].)[31] Hill's attempt to lessen the standard of materiality applicable to a *Brady* violation by incorporating *Napue's* false evidence standard is not persuasive.

### 2. *Hill Made a Sufficient Prima Facie Showing of Materiality.*

We concluded above, under the *Napue* materiality standard, that Hill made a prima facie case by showing a reasonable likelihood the prosecution's

---

[31] *United States v. Ausby* explained that although the Supreme Court in *Wearry* "may have implied" that it viewed the *Napue* and *Brady* standards as "equivalent" by "cit[ing] the *Napue* standard when discussing a *Brady* claim," "*Wearry* was a per curiam, unargued decision 'without full briefing' that made only a passing reference to the standards in question and did not provide clear guidance on this point. *Wearry,* 577 U.S. at 392 (Alito, J., dissenting). 'That procedural posture is not one in which we would expect the Supreme Court to change the standard for an important issue like *Brady* materiality.' *Prystash* [*v. Davis, supra,*] 854 F.3d at [p.] 838[,] n.6. And in post-*Wearry* decisions, the Supreme Court . . . [has] continued to describe the *Brady* standard in the traditional way. *E.g.,* [*Turner, supra,*] 582 U.S. [at p.] 324 . . . . Accordingly, we continue to understand the *Brady* and *Napue* standards as distinct." (*Juniper v. Davis, supra,* 74 F.4th at p. 212, fn. 14.)

failure to disclose exhibit 38 and use of false or misleading evidence and argument could have affected the way the case was presented to the jury and the jury's evaluation of the evidence. Hill's *Brady* claim requires us to determine whether there is a reasonable probability that the result at trial would have been different if exhibit 38 had been disclosed. Although this is a more difficult standard for Hill to meet, for the same reasons earlier discussed, we conclude his showing was sufficient to make a prima facie case.

Materiality, for *Brady* purposes, "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." (*Kyles, supra,* 514 U.S. at p. 434.) "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " (*Ibid.,* quoting *Bagley, supra,* 473 U.S. at p. 678.)

As we have explained, the suppression of exhibit 38 allowed McCray to deny having received leniency from the prosecution and to exercise his privilege against incrimination and allowed the prosecution to, in effect, create McCray's unavailability by declining to give him immunity and then present McCray's statements incriminating Hill with no opportunity for the defense to cross examine McCray. We will not reiterate our discussion above of the various ways the trial could have proceeded and potential impact of undermining McCray's credibility as well as the credibility of almost all the other prosecution witnesses with the previously suppressed evidence of leniency, assistance and rewards they received. Ultimately, taking the

allegations of the petition as true, the probability that disclosure of exhibit 38, considered along with the suppressed evidence of the self-interest and bias of so many of the other prosecution witnesses, is sufficient to "put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles, supra,* 514 U.S. at p. 435.)  Accordingly, Hill established a prima facie case of materiality, and his *Brady* claim should have been allowed to proceed.[32]

## DISPOSITION

The order denying subclaims A-G of claim 2 of the petition for habeas corpus for failure to state a prima facie case for relief is reversed, as is the denial of claim 16.  The matter is remanded with directions to issue an order to show cause.

---

[32] The trial court did not separately address claim 16 of the petition, cumulative error, because it found no error to cumulate.  Given our determination that Hill stated a prima facie case for relief on his *Napue* and *Brady* claims, we reverse the trial court's order as to claim 16 as well.

64

_____

STEWART, P. J.


We concur.


_____

RICHMAN, J.


_____

MILLER, J.


*In re Hill* (A166191)


65

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re MICHAEL S. HILL,<br><br>on Habeas Corpus. | A166191<br><br>(Alameda County<br>Super. Ct. No. HC846751)<br><br>**ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed August 2, 2024, be modified as follows:

On page 22, delete footnote 12 in its entirety. There is no change in judgment.

Further, the opinion in the above-entitled matter filed August 2, 2024, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

1

Trial Court:Alameda County Superior Court

Trial Judge:        Hon. Morris Jacobson

Counsel:

McBreen & Senior, David A. Senior, Sara M. Cohbra, and Ann K. Tria, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, James William Bilderback II, Assistant Attorney General, Alice B. Lustre, Jill M. Thayer, Deputy Attorneys General, for Respondent.